## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM POTTS,** | : | |
| **Plaintiff** | : | **No. 1:22-cv-01653** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **CLEVELAND-CLIFFS, INC., et al.,** | : | |
| **Defendants** | : | |

### MEMORANDUM

This case arises from allegations of retaliation and discrimination by Plaintiff William

Potts ("Plaintiff") against his former employer Defendant Cleveland-Cliffs, Inc. ("Defendant C-

Cliffs"), and former supervisors Karl Rinke ("Defendant Rinke"), Cory Chappell ("Defendant

Chappell"), and John and Jane Does (collectively "Defendants").  Plaintiff asserts that

Defendants violated his civil rights by subjecting him to disparate treatment, harassment, and

termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000(e) et seq., 42 U.S.C. § 1981 ("Section 1981"), and the Age Discrimination in Employment

Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634.  (Doc. No. 1 at 1.)  Before the Court is

Defendants' motion for summary judgment.  (Doc. No. 47.)  For the reasons that follow, the

Court will grant Defendants' motion in its entirety.

## I.    BACKGROUND[1]

Plaintiff, an African American man, was born in the year 1945.  (Doc. No. 47-3 ¶ 2.)

Beginning in 1976, Plaintiff "worked at the [s]teel [m]ill currently owned and operated by

---

[1]  The following relevant facts are taken from Defendants' Statement of Undisputed Material
Facts ("SUMF") (Doc. No. 47-3) and Plaintiff's Response to Defendants' Statement of
Undisputed Material Facts ("RSUMF") (Doc. No. 52), and are undisputed unless otherwise
noted.  Both the SUMF and RSUMF contain specific citations to the record at each numbered
paragraph.

[Defendant C-Cliffs] in Steelton, Pennsylvania." (Id. ¶ 2.) While employed by Defendant C-Cliffs, Plaintiff was a Maintenance Technician Mechanical employee who performed welding duties. (Id. ¶ 3.) "During the time period relevant to [Plaintiff's] claims", he worked under the supervision of the Area Manager of Steelmaking, Defendant Rinke. (Id. ¶ 4.) Defendant C-Cliffs maintains an equal opportunity policy that states "employment decisions will be made based upon skills and qualifications, not protected characteristics." (Id. ¶ 7.) Defendant C-Cliffs allows employees to complain about suspected discrimination to a "manager, Human Resources [("HR")], an alert line, or the Joint Committee on Civil Rights." (Id. ¶ 8.) In addition, Defendant C-Cliffs provides "annual antidiscrimination and harassment training to its employees." (Id. ¶ 9.)

John Martz was a coworker of Plaintiff who is characterized as "an hourly employee and union member." (Id. ¶ 10.) The parties dispute whether Martz was a supervisor. Compare (id. with Doc. No. 52 at 3).[2] The parties agree, however, that Martz held the role of maintenance supervisor at least during the COVID-19 pandemic and that position lacked the ability to "discipline or fire individuals." (Doc. Nos. 47-3 ¶¶ 11–12; 52 at 3.) The parties dispute the reason why Martz's position lacked the ability to discipline or fire individuals. Compare (Doc. No. 47-3 ¶ 12 with Doc. No. 52 at 3).[3]

_____

[2] Defendants maintain that Martz is not a supervisor (Doc. No. 47-3 ¶ 10), whereas Plaintiff maintains that Martz became a supervisor in 2020 (Doc. No. 52 at 3).

[3] Defendants maintain that Martz lacked the authority to hire individuals, fire employees, or issue discipline because "he wished to retain his union membership." (Doc. No. 47-3 ¶¶ 11–12.) Plaintiff maintains that the authority to discipline employees was "purposely left out of the agreement," and no testimony establishes that the other employees, including Plaintiff, knew that Martz lacked that authority. (Doc. No. 52 at 3.)

Martz called Plaintiff "Black Richie," and Plaintiff called Martz "White Richie." (Doc. No. 47-3 ¶ 13.) The nicknames come from a local high school football game in which a black player was "hit in the head with a soda cup", and spectators yelled "get off the field, Black Richie". (Id. ¶ 13.) The parties dispute whether Plaintiff and Martz "jokingly" called each other by those names. Compare (id. ¶ 13 with Doc. No. 52 at 4).[4] The parties agree, however, that Plaintiff told Martz to stop calling him "Black Richie." (Doc. Nos. 47-3 ¶ 15; 52 at 4–5.) Plaintiff "never told [] Martz that 'Black Richie' made him feel uncomfortable." (Doc. No. 47-3 ¶ 14.) Although the parties dispute Plaintiff's thoughts on the nickname, compare (id. ¶ 16 with Doc. No. 52 at 5),[5] they agree that Plaintiff testified that Martz "made regular racist remarks" by referring to Plaintiff as "Black Richie" (Doc. No. 47-3 ¶ 17). Another coworker Jeremy Dreibelbis ("Dreibelbis") referred to Plaintiff as "Richie" when he was around Martz. (Id. ¶¶ 33–34.) Defendant Rinke was present "a couple of times" when Martz called Plaintiff "Richie," but Plaintiff did not inform Defendant Rinke about the origin of the nickname. (Id. ¶ 18.)

Martz also used the n-word at work "here and there." (Id. ¶ 19.) Plaintiff told Martz to stop using the n-word. (Id. ¶ 19.) Plaintiff cannot recall any occasion where Martz used the n-word in front of Defendant Rinke or Defendant Chappell. (Id. ¶ 20.) Defendant Rinke "never heard employees use the n-word at [the steel mill]" and "was not present when Mr. Martz used the n-word." (Id. ¶¶ 80, 83.) It is undisputed that Plaintiff never heard Defendants Rinke or Chappell use the n-word. (Id. ¶ 84.)

---

[4] Defendants assert that Plaintiff and Martz "jokingly" called each other by those names (Doc. No. 47-3 ¶ 13), but Plaintiff alleges that he did not consider it a joke (Doc. No. 52 at 4).

[5] Defendants argue that Plaintiff "didn't think nothing [sic] of" Martz calling him "Black Richie." (Doc. No. 47-3 ¶ 16.) Plaintiff, however, asserts that he thought it was a "racist remark." (Doc. No. 52 at 5.)

Martz is the only employee who "used racial epithets, told jokes about African Americans, or harassed [Plaintiff] based on his race." (Id. ¶ 21.)  Martz once joked that Plaintiff was so dark that "[it] [did]n't even look like he ha[d] a mask on" when Plaintiff was wearing a black face mask. (Id. ¶ 22.)  Plaintiff "never told Martz that Martz's comment about his mask made him feel uncomfortable" (id. ¶ 23), but Plaintiff asserts that he "just wanted to get out of there, get the job done," and he "was doing some work for Martz, too" (Doc. No. 52 at 6).  Plaintiff testified that Defendant Chappell "was present and laughed at the remark." (Doc. No. 47-3 ¶ 24.)

Martz also opined that he "did not approve of interracial dating," and "talked about black men at his gym who date white [women] about once or twice a month." (Id. ¶¶ 25–26.)  Before Plaintiff's wife passed in 2016, Martz targeted Plaintiff for being married to a white woman, saying Plaintiff's marriage "wasn't right." (Doc. Nos. 47-3 ¶ 27; 52 at 7.)  Plaintiff did not react to the race-based nature of Martz's comments because he did not see his wife as white, based on her indigenous Canadian ancestry. (Doc. No. 47-3 ¶ 27.)  However, Plaintiff told Martz to stop and that it was not Martz's business. (Doc. No. 52 at 7.)  Plaintiff did not report to Defendant Rinke that "Plaintiff thought Martz was racist." (Doc. No. 47-3 ¶ 28.)

Martz also commented on Plaintiff's age by saying Plaintiff should retire. (Id. ¶ 29.)  Plaintiff responded to Martz's comment by telling Martz that he should retire instead. (Id. ¶ 30.)  Martz was born in 1957 (twelve years after Plaintiff) and was in his sixties (60s) at the time. (Id. ¶¶ 30, 31.)  Plaintiff, however, did not report the comments to Defendant Rinke, Defendant Chappell, or HR. (Id. ¶ 32.)

Plaintiff "worked alone for the last six to seven years of his employment" and "had help on occasion but on average he had no help." (Id. ¶¶ 70, 73–74.) The parties dispute, however, the frequency with which Plaintiff had help. Compare (id. ¶¶ 71–72 with Doc. No. 52 at 10).[6]

At one time, Defendant C-Cliffs' manager of HR/Labor Relations Julie Maldonado ("Maldonado") received a report that someone used the n-word and investigated the incident. (Doc. No. 47-3 ¶¶ 67, 76.) During that investigation, Maldonado spoke with Plaintiff and interviewed two of Plaintiff's white coworkers. (Id. ¶¶ 77–78.) As a result of the investigation, "no one was disciplined because three individuals that were interviewed stated the n-word was not used and one individual stated it was used." (Id. ¶ 79.)

On at least one occasion before September 29, 2021, Defendant Rinke gave Plaintiff a verbal warning for not wearing the proper personal protective equipment ("PPE"). (Id. ¶ 35.) On September 29, 2021, Defendant Rinke observed Plaintiff without the proper PPE and "sent him home for the day as a disciplinary consequence." (Id. ¶ 36.) The parties dispute whether Plaintiff left work as directed. Compare (id. ¶ 37 with Doc. No. 52 at 8).[7] On October 29, 2021, Defendant Rinke, Dreibelbis, and Plaintiff had a "Take 5 meeting" in which "they discussed locking out and tagging out the furnace and the PPE needed for the job." (Doc. No. 47-3 ¶ 38.) Defendant C-Cliffs implemented Take 5 meetings as part of its safety program "upon assuming the Steelton steel mill." (Id. ¶ 39.) A Take 5 meeting is where employees "review[] the hazards

---

[6] Defendants maintain that Plaintiff "sometimes had help from coworkers," in that he "usually had help from coworkers with the chains that are hooked to the pan because they are huge." (Doc. No. 47-3 ¶¶ 71–72.) Plaintiff maintains that he received "very little help, always needed help[,] [a]nd [Defendants] knew that" because he "would ask for help constantly[.]" (Doc. No. 52 at 10.) Plaintiff also maintains that "[Defendants] never hired help for [him]" despite "hiring a lot of people." (Id.)

[7] Defendants assert that two managers informed Defendant Rinke that Plaintiff had not left and continued to work. (Doc. No. 47-3 ¶ 37.) Plaintiff maintains that he left. (Doc. No. 52 at 8.)

of a particular job, discuss[] what PPE is needed, and [discuss] how to control hazards as in locking out and tagging out the equipment." (Id. ¶ 40.) The Take 5 meeting also concerned "the method of safe ingress into the furnace," i.e., "accessing the furnace by climbing a ladder from the side platform onto the pan, which would be placed in the furnace." (Id. ¶ 42.) Plaintiff does not dispute that the meeting occurred and concerned those subjects, but he clarifies that there are several furnaces at the steel mill and the Take 5 meeting concerned furnace number 8 and not furnace number 7. (Doc. No. 52 at 8.)

Because Defendants' furnaces melt scrap metal and "reach[] over 3,000 degrees Fahrenheit" (Doc. No. 47-3 ¶ 44), employees must wear the proper PPE of a silver aluminized jacket and spats to enter the furnace (id. ¶ 41). Normal protocol for entering the furnace is by using a ladder. (Id. ¶ 43.) Dreibelbis notified Defendant Rinke that "he observed [Plaintiff] riding the pan, suspended by an overhead crane, into the furnace, instead of using the ladder" and without the proper PPE. (Id. ¶¶ 45–46.) Plaintiff's actions "constitute[d] a major safety violation." (Id. ¶ 46.) Defendant Rinke confirmed the violation through video footage and requested Plaintiff to report to his office with his union representative. (Id. ¶¶ 47–48.) In the meeting with Defendant Rinke, Plaintiff admitted that he "did not place his lock on the furnace lockbox" or "verify the furnace was locked out." (Id. ¶ 49.) At the conclusion of the meeting, Defendant Rinke suspended Plaintiff due to the severity of his safety violations. (Id. ¶ 50.)

One of Defendants' white employees, Richard Jensen ("Jensen"), was also disciplined for "multiple safety infractions and was suspended with intent to discharge." (Id. ¶ 51.) Jensen's specific violations were "fail[ing] to wear the proper PPE and fail[ing] to lock out/tag out the equipment on which he was working." (Id. ¶ 52.)

It is undisputed that, on October 29, 2021, Plaintiff performed welding work without the proper PPE, without locking out/tagging out the furnace, and improperly entering the furnace by a pan lifted by a crane instead of a ladder.  (Id. ¶ 53.)  However, Plaintiff clarifies that the furnace was out of service, at night, while the mill was closed, and no other staffers were there.  (Doc. No. 52 at 9.)  Plaintiff further explains that there were no dangers, he wore the partial PPE that was usual for out of service furnaces at night, and the procedures for "cold" furnaces (i.e., out of service) are different from "hot furnaces."  (Id.)  Plaintiff acknowledged during his deposition that his actions were unsafe.  (Id. ¶¶ 6, 54.)  Plaintiff also admitted: (1) he should have worn the proper PPE; (2) he should have locked out the furnace; (3) he should not have entered the furnace via the pan on the overhead crane; and (4) he did not follow Defendant C-Cliffs' safety rules.  (Id. ¶¶ 5, 54–58.)

On November 1, 2021, Defendant C-Cliffs "suspended [Plaintiff] with intent to discharge due to his safety infractions on October 29, 2021."  (Id. ¶ 59.)  Plaintiff's union "grieved his suspension with intent to discharge".  (Id. ¶ 60.)  Plaintiff attended a Step Two grievance meeting with his two union representatives and Defendant Rinke.  (Id. ¶ 61.)  In the meeting, Defendant Rinke "asked Plaintiff what he would do differently moving forward if they overturned his suspension."  (Id. ¶ 62.)  Defendant Rinke got the impression that Plaintiff's answer was "insincere" and "worried that … [Plaintiff] would potentially have a very serious accident."  (Id.)  Therefore, Defendant Rinke "denied the Step Two appeal."  (Id. ¶ 62.)  He told Plaintiff that "it was not that he did not want Plaintiff to have a job, but that he did not feel

comfortable bringing [Plaintiff] back when he demonstrated a history of noncompliance regarding safety."  (Id. ¶ 63.)[8]

Defendant C-Cliffs terminated Plaintiff's employment effective November 30, 2021.  (Id. ¶ 65.)  Maldonado was involved with the termination decision and conferred with Defendant Rinke to ensure the termination conformed with policies and "consistency of discipline."  (Id. ¶¶ 66–68.)  Defendant Chappell did not participate in the decision to terminate Plaintiff.  (Id. ¶ 69.)

On October 20, 2022, Plaintiff initiated this action against Defendants, Martz, and Dreibelbis, alleging that they violated Title VII, Section 1981, and the ADEA.  (Doc. No. 1.)  On January 30, 2023, Defendants filed an answer.  (Doc. No. 19.)  On February 22, 2023, Plaintiff, Martz, and Dreibelbis stipulated to the dismissal of Plaintiff's claims against Martz and Dreibelbis.  (Doc. No. 20.)  The Court held a case management conference on May 25, 2023, and afterwards set a close of fact discovery deadline of October 31, 2023.  (Doc. Nos. 21, 25.)  Following a post discovery status conference held on November 7, 2023, and a separate status conference held on December 7, 2023, the Court set a dispositive motion deadline of June 28, 2024.  (Doc. No. 42.)  On June 6, 2024, Defendants requested an extension of time to file their dispositive motion.  (Doc. No. 43.)  The Court granted the motion and set July 30, 2024, as the new dispositive motion deadline.  (Doc. No. 44.)  Defendants filed their motion for summary judgment on July 30, 2024, with a brief in support and SUMF.  (Doc. Nos. 47–48.)  On September 20, 2024, after the Court granted Plaintiff an extension of time (Doc. No. 50), Plaintiff filed his brief in opposition and RSUMF (Doc. Nos. 51–52).  On October 17, 2024, after the Court granted Defendants an extension of time (Doc. No. 54), Defendants filed their reply

_____

[8]  Also, "[Plaintiff] did not raise any complaint of race or age discrimination" at the Step Two meeting.  (Id. ¶ 64.)

brief (Doc. No. 55).  Having been fully briefed, the motion for summary judgment is ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the

non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

Defendants' motion seeks the entry of summary judgment as to all of Plaintiff's Title VII, Section 1981, and ADEA employment discrimination claims.  The Court first reviews the legal standards applicable to Title VII and Section 1981 claims of disparate treatment and hostile work environment and ADEA claims of age discrimination before discussing the arguments of the parties as to Defendants' motion for summary judgment.  Finally, the Court determines whether summary judgment is appropriate as to each of the pending claims.

### A.    Title VII, Section 1981, and ADEA Legal Standards

#### 1.    Title VII, Section 1981, and ADEA Disparate Treatment Legal Standard

Plaintiff asserts that he faced disparate treatment because of his race and age.  In disparate treatment cases under Title VII and Section 1981 and age discrimination cases under ADEA,[9] a case "is made out when an individual of a protected group is shown to have been

---

[9]  Because the United States Court of Appeals for the Third Circuit ("Third Circuit") has supported the use of the McDonnell Douglas burden shifting framework for Title VII employment discrimination claims, Section 1981 discrimination claims, and ADEA discrimination claims, the Court presents the law singularly, but addresses the Title VII and Section 1981 disparate treatment and hostile work environment claims together and separately addresses the ADEA claim.  See Brown v. J. Kaz, Inc., 581 F.3d 175, 181–82 (3d Cir. 2009) ("[W]e have previously held that the substantive elements of a claim under [S]ection 1981 are generally identical to the elements of an employment discrimination claim under Title VII.");

singled out and treated less favorably than others similarly situated on the basis of [a protected class]."  See Qin v. Vertex, Inc., 100 F.4th 458, 472 (3d Cir. 2024) (quoting Equal Emp't Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)).

Where circumstantial evidence[10] is used to prove discriminatory intent, courts utilize the McDonnell Douglas burden shifting framework for Title VII, Section 1981, and ADEA claims. See Qin, 100 F.4th at 472–73 (applying the McDonnell Douglas burden shifting framework to a Title VII and Section 1981 case); Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (applying the McDonnell Douglas burden shifting framework to an ADEA case).  The analysis under the burden shifting framework starts with the plaintiff establishing a prima facie case of disparate treatment.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  A prima facie case is established when, by a preponderance of the evidence, the

---

McKenna v. Pac. Rail Serv., 32 F.3d 820, 826 n.3 (3d Cir. 1994) ("[T]he shifting burden analysis with which [McDonnell Douglas] is now synonymous also has been applied in … [S]ection 1981 cases and age discrimination cases.")

[10]  Plaintiff does not assert that there is direct evidence of Title VII, Section 1981, and ADEA disparate treatment.  See (Doc. Nos. 48, 51).  Even if Plaintiff argued that he identified direct evidence of disparate treatment by way of Martz's commentary, jokes, and nicknames, the Court concludes that the evidence of record does not "link the [perpetrator of the discriminatory incidents] to the employer's adverse employment action" because Plaintiff proffers no evidence to show that any discriminatory comments are attributable to his employer.  See Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).  Although Plaintiff asserts that Martz held a supervisory role, Martz was not a supervisor or decision-maker as a matter of law because his authority extended only to "assign[ing] daily tasks[,] coordinat[ing] with operations on a routine basis[,] and being responsible for making sure that [they] had ample supply of spare parts and supplies" (Doc. No. 47-5 at 4).  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761–62 (1998) (explaining that a supervisor is one who can make a tangible employment decision such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits).  In addition, Plaintiff fails to identify evidence that Martz's comments are connected to Defendant Rinke and Maldonado's decision to terminate his employment.  See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 514 (3d Cir. 1997) ("[S]tatements that are unconnected to the decision at issue, even if made by people who hold positions of authority with the employer, are not direct evidence of unlawful discharge.").

plaintiff shows: (1) he or she is a member of a protected class; (2) he or she is qualified for the position; (3) he or she suffered an adverse employment action; and (4) either the adverse employment action occurred under circumstances giving rise to an inference of intentional discrimination or similarly-situated non-members of a protected class were treated more favorably.  See id. at 410–11.

In order to raise an inference of discrimination, a plaintiff must show acts that "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978); see also Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356 (3d Cir. 1999) (explaining that "Supreme Court precedent … clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion'").  In the ADEA context, the fourth element is proven by a showing that defendants ultimately replaced a plaintiff with another employee who was younger, or by providing evidence of "facts which if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  See Willis, 808 F.3d at 644 (internal quotations and citation omitted).

Once a prima facie case has been shown, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant is able to provide a legitimate, nondiscriminatory reason, then the burden shifts back to plaintiff to prove, by a preponderance of the evidence, that the legitimate reason provided by defendant was pretext for discrimination.  See id. at 804; Jones, 198 F.3d at 412.

At the summary judgment stage, the Third Circuit has instructed that a plaintiff may defeat a summary judgment motion by "pointing 'to some evidence, direct or circumstantial,

from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" See Jones, 198 F.3d at 413 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996)).  Under the disbelief factor of Fuentes, the Third Circuit instructs that "the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  See id. (quoting Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108–09 (3d Cir. 1997)).  In the alternative, to establish pretext based on the argument that a discriminatory reason was "more likely than not a motivating or determinative cause," a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that [race or age] was a motivating or determinative factor."  See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644–45 (3d Cir. 1998) (citing Keller, 130 F.3d at 1111).  Specifically, a plaintiff must point to evidence demonstrating that: (1) "the employer has previously discriminated against the plaintiff;" (2) "the employer has previously discriminated against other persons within Plaintiff's protected class;" or (3) "the employer has treated more favorably similarly situated persons not within the protected class."  See id. at 645.

14

### 2.   Title VII and Section 1981 Hostile Work Environment Legal Standard[11]

Hostile work environment claims under Title VII and Section 1981 are governed by the same legal standard.  See Qin, 100 F.4th at 469, 471 (making no distinction between the legal standard applied to Title VII and Section 1981 hostile work environment claims).  To succeed on a hostile work environment claim, a plaintiff must demonstrate: (1) the employee suffered "intentional discrimination" based upon a protected class; "(2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there was respondeat superior liability."  See Nitkin v. Main Line Health, 67 F.4th 565, 570 (3d Cir. 2023).  "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

The Third Circuit directs that severe or pervasive discrimination must "alter the conditions of the victim's employment and create an abusive work environment."  See Nitkin, 67 F.4th at 570 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  The severe or

---

[11]  The Court notes that although Plaintiff did not assert a claim of hostile work environment under the ADEA, see (Doc. No. 1 ¶¶ 68–83), Defendants' motion for summary judgment contemplates an ADEA hostile work environment claim (Doc. No. 48 at 13–14).  The Court will disregard the parts of Defendants' brief relating to an ADEA hostile work environment claim because Plaintiff has not asserted that kind of claim.  There is also an outstanding question in the Third Circuit as to whether the ADEA supports a hostile work environment claim.  See Laymon v. Honeywell Int'l Inc., 645 F. Supp. 3d 443, 457 n.9 (W.D. Pa. 2022) (citing Slater v. Susquehanna County, 465 F. App'x 132, 138 (3d Cir. 2012) (unpublished)) (stating that the Third Circuit has not determined whether the ADEA supports a hostile work environment claim).

pervasive discrimination must also "create[] an attitude of prejudice that injects hostility and abuse into the working environment," see Ali v. Woodbridge Twp. Sch. Dist., 957 F.3d 174, 182 (3d Cir. 2020).  Further, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate," instead the "'conduct must be extreme' to satisfy this standard."  See Nitkin, 67 F.4th at 570 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  However, "[a]n extreme isolated act of discrimination can create a hostile work environment."  See Castleberry v. STI Grp., 863 F.3d 259, 265 (3d Cir. 2017).

**B.    Arguments of the Parties**

As noted supra, Defendants move for summary judgment as to all of Plaintiff's claims. (Doc. No. 48 at 13.)  The Court begins with Plaintiff's Title VII and Section 1981 claims of disparate treatment discrimination before turning to his Title VII and Section 1981 hostile work environment claims and ADEA claim of disparate treatment discrimination.

First, Defendants argue that Plaintiff's Title VII and Section 1981 disparate treatment claims fail because Plaintiff cannot establish the fourth element required to prove his prima facie case.  Defendants assert that the undisputed evidence of record demonstrates that Plaintiff was fired by Defendant Rinke and Maldonado for safety infractions such as failing to wear the required PPE (e.g., his safety glasses and aluminized jacket) on September 29 and October 29, 2021, failing "to lock out and tag out the furnace before entering," and riding a pan suspended by an overhead crane into a furnace.  (Id. at 14.)  Moreover, Defendants argue that the October 29, 2021 safety infractions occurred after Defendant Rinke and Dreibelis had the Take 5 meeting with Plaintiff and that Plaintiff admitted to committing the safety violations.  (Id.)

Defendants assert that, even if the Court determines that Plaintiff established a prima facie case of disparate treatment under Title VII or Section 1981, they satisfy their obligation to

articulate a legitimate, nondiscriminatory reason for Plaintiff's termination with the explanation that the safety violations were the reason for Plaintiff's termination. (Id.) Therefore, the burden shifts back to Plaintiff to point to sufficient evidence from which a factfinder could reasonably either disbelieve Defendants' articulated legitimate, nondiscriminatory reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the adverse employment action. (Id.) Defendants contend that "[Plaintiff's] admission makes it impossible for a rational factfinder to find the … safety violations to which [Plaintiff] admits, unworthy of credence." (Id. at 15.) Further, Defendants argue that Plaintiff cannot meet his burden of showing that Defendants' articulated reason for his termination is pretextual because Plaintiff has failed to identify evidence of discriminatory treatment by Defendant Rinke or Maldonado, the decision-makers. (Id. at 16.) Defendants then explain that Plaintiff has failed to identify evidence of "any white comparators who engaged in similar conduct to him and were not terminated" or evidence "that Defendants discriminated against any other members of his protected class or other protected categories of persons." (Id.)

As to Plaintiff's Title VII and Section 1981 hostile work environment claims, Defendants contend that Plaintiff cannot demonstrate the severe or pervasive prong of the hostile work environment test with the evidence of: Martz's use of the n-word; Maldonado's interview of Plaintiff for the n-word incident; Plaintiff's working alone; Martz's comments on interracial dating; the "Black Richie" nickname for Plaintiff; and the "joke" about Plaintiff's skin color. (Id. at 23.) Defendants argue that courts in this district have held that use of the n-word, absent evidence that it was used directly against a plaintiff, is insufficient to support the severe or pervasive prong. (Id. at 24–25.) Defendants then assert that Plaintiff's evidence of the interview with Maldonado and working alone are "facially neutral," while evidence of Martz's interracial

couple and skin-color comments and "Black Richie" nickname for Plaintiff are examples of "sporadic use of abusive language." (Id. at 25–27.)

As to Plaintiff's ADEA discrimination claim, Defendants argue "[Plaintiff] has not set forth any evidence that his termination occurred under circumstances that portend age discrimination." (Id. at 19.) Defendants assert that the only evidence Plaintiff proffers to support an age discrimination claim is the fact that he was seventy-six (76) years old at the time of his termination and Martz, a coworker, made statements about his retirement. (Id.) Defendants maintain that, even if Plaintiff could establish a prima facie case, the undisputed evidence of record cannot demonstrate that Plaintiff's termination for the safety violations is pretextual and that his age was the but-for cause of his termination. (Id. at 20.)

Finally, Defendants address Plaintiff's assertion of individual liability under Title VII, Section 1981, and ADEA against Defendants Chappell and Rinke. (Id. at 30.) Defendants argue that those claims fail as a matter of law because Title VII and ADEA do not recognize individual liability. (Id.) Although individual liability is available under Section 1981, Defendants assert that Plaintiff cannot establish individual liability for Defendants Chappell and Rinke because Plaintiff fails to show that his termination was under circumstances that give rise to the inference of intentional discrimination (to satisfy a prima facie case) or that their nondiscriminatory reason for terminating Plaintiff is pretextual. (Id. at 31.) Moreover, Defendants assert that any individual liability claim against Defendants Chappell and Rinke fails because Plaintiff adduces no evidence that Defendants Chappell or Rinke were personally involved in any intentionally discriminating behavior beyond overhearing a comment or nickname from Martz. (Id. at 32.)

In response, Plaintiff contends that a genuine dispute of material fact exists because he adduced evidence that, when viewed in the light most favorable to him, establishes race and age

discrimination and a hostile work environment. (Doc. No. 51.) As to his Title VII and Section 1981 discrimination claims, Plaintiff first argues that the evidence indicates that his termination occurred under circumstances giving rise to an inference of racial discrimination so as to establish the fourth element of a prima facie case. (Id. at 3.) Plaintiff points to the fact that he worked for forty-five (45) years at the Steelton plant without any disciplinary infractions until the September 29 and October 29, 2021 safety violations. (Id. at 4–5.) He also points to the facts that no other black men worked at the steel mill during the relevant timeframe, and Defendants offered him severance pay. (Id.) Further, Plaintiff argues that Martz held a supervisory position over Plaintiff, made disparaging comments about Plaintiff's marriage and other interracial marriages, joked about the darkness of Plaintiff's skin color, and gave Plaintiff the nickname "Black Richie." (Id. at 5–6.)

Plaintiff then asserts that a reasonable factfinder could disbelieve Defendants' reason for his termination because "the two reasons [Defendants] give for [Plaintiff's] termination were minor." (Id. at 8.) Plaintiff alternatively asserts that the evidence would lead a reasonable factfinder to conclude that there was discriminatory treatment because the evidence shows that Defendants "did not make such extreme, discriminatory decisions with regard to Plaintiff's employment in the past." (Id. at 8.) Next, Plaintiff indicates that Defendants did not give him an oral or written warning after the September 29, 2021 violation, and they do not keep disciplinary records for longer than two years, which inhibits the finding of a comparator. (Id. at 8–9.)

As to his ADEA claim, Plaintiff argues that it is supported by sufficient evidence as well. Plaintiff explains that evidence of his noticeably advanced age for his field, Martz's persistent comments about Plaintiff retiring, and Dreibelbis' and Defendant Rinke's presence for Martz's age-related comments all support his ADEA claim of discrimination. (Id. at 10–11.)

19

Plaintiff also asserts that he has adduced sufficient evidence to establish a genuine dispute of material fact as to the individual liability of Defendants Chappell and Rinke. Plaintiff maintains that the Court must conclude that there is at least a genuine dispute of material fact as to Defendants Chappell's and Rinke's individual liability because they were present for Martz's comments and conduct and condoned Martz's behavior. (Id. at 23–24.)

Lastly, as to his hostile work environment claims, Plaintiff contends that he has adduced evidence that satisfies the "severe or pervasive" prong of the hostile work environment test. (Id. at 17.) Plaintiff points to the evidence of Martz's frequent use of the n-word, Defendants' presence for the use of the n-word, and Martz's other comments and conduct to demonstrate the pervasiveness of the racially discriminatory conduct. (Id. at 19–20.)

### C.    Analysis

#### 1.    Plaintiff's Title VII and Section 1981 Claims of Disparate Treatment Discrimination and Hostile Work Environment

##### a.    Title VII and Section 1981 Disparate Treatment Discrimination

As an initial matter, the Court need not resolve the parties' dispute regarding whether Plaintiff has adequately demonstrated the fourth element of a prima facie case of discrimination, because even assuming that he has, and upon review of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has failed to produce sufficient evidence demonstrating that Defendants' legitimate, nondiscriminatory reason for terminating his employment—namely, Plaintiff's failure to adhere to proper safety protocols and guidelines—was a pretext for discrimination. As noted above, for Plaintiff's disparate treatment claims to survive summary judgment when his former employer articulates a legitimate, nondiscriminatory reason for its action, the burden shifts to Plaintiff to demonstrate pretext by either "(i) discrediting the

proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See Fuentes, 32 F.3d at 764; accord Qin, 100 F.4th at 474–75 (reiterating Fuentes' two prong approach for determining pretext). In attempting to meet that burden, Plaintiff identifies several pieces of evidence that he maintains are sufficient for a factfinder to reasonably either disbelieve Defendants' articulated reason for termination or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendants' action. The Court addresses each in turn.

Plaintiff first argues that a reasonable factfinder could disbelieve Defendants' articulated reason for termination because the reasons for Plaintiff's termination were minor. (Doc. No. 51 at 8.) However, the Court sees nothing minor or necessarily suggestive of pretext in a situation where Plaintiff was terminated for safety violations in a workplace with furnaces that reach over 3000 degrees Fahrenheit. (Doc. No. 47-3 ¶ 44.) It is undisputed that Defendant Rinke's reason for suspending Plaintiff pending termination after his safety violation was the severity of the safety infraction. (Id. ¶¶ 45, 50 (stating that Plaintiff's riding on the pan constituted a "major safety violation").) Plaintiff has pointed to no evidence suggesting that his safety violations were actually "minor." See generally (Doc. No. 52). Even if Plaintiff's violations were "minor," his violation of safety precautions on October 29, 2021, came directly after Dreibelbis and Defendant Rinke explained the necessary safety protocols in the Take 5 meeting and two prior safety violations. (Doc. No. 47-3 ¶¶ 35–36, 38–40.)

Plaintiff next attempts to demonstrate that discrimination was more likely than not a motivating or determinative cause of his termination by pointing out his lack of a disciplinary history, lack of warning after the September 29, 2021 safety violation, and Defendants' policy of

failing to keep disciplinary records for longer than two years.  (Doc. No. 51 at 7–9.)  The Court is unpersuaded that Plaintiff's lack of a disciplinary history, the lack of warning after the September 29, 2021 safety violation, and Defendants' policy of failing to keep disciplinary records for longer than two years is demonstrative of pretext for Defendants' intentional discrimination. Plaintiff admitted to committing "major" safety violations.  (Id. ¶¶ 45, 53–58.)  Plaintiff also points to no evidence showing that his termination, despite his lack of a disciplinary history or warning, is or was violative of any law or internal policy of Defendant C-Cliffs.  In addition, Plaintiff fails to identify evidence that Defendants' disciplinary record maintenance policy is violative of any law or industry standard.  Without more, these allegations are insufficient for a factfinder to reasonably disbelieve Defendants' legitimate articulated reason for Plaintiff's termination.

Plaintiff also points to "the racial slurs he was subjected to on a regular basis" in support of his claim of pretext.  The Court acknowledges that the undisputed evidence of record evinces reprehensible and offensive racial commentary by Martz.  (Doc. Nos. 47-3 ¶¶ 17, 19–28; 52 at 4–6.)  As many courts have opined, the use of the n-word is particularly "odious and offensive" in the workplace.  See Thomas v. Bronco Oilfield Servs., 503 F. Supp. 3d 276, 299–300 (W.D. Pa. 2020) (listing numerous cases opining on the offensiveness of the n-word from courts within and without this Circuit).  In addition, Plaintiff points to the undisputed evidence of record of Martz's nickname for him and Martz's discriminatory comments about his marriage, interracial marriages in general, and his skin color.  (Doc. Nos. 47-3 ¶¶ 13–15, 19, 22, 27; 52 at 6–7.)  However, it is also undisputed that Martz did not have the ability to hire, fire, promote, or demote Plaintiff. Without that power, Martz lacked the authority to impose an adverse action on Plaintiff that would have provided the causal connection between the discriminatory behavior and Plaintiff's

termination. See Burlington Indus., Inc., 524 U.S. at 761 (stating that an adverse action is one such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits); Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 691 (E.D. Pa. 2016) (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)) (granting summary judgment in favor of defendant where plaintiff failed to point to evidence of racially discriminatory animus on the part of the decision-makers in her termination). Therefore, Martz necessarily could not have taken the adverse employment action against Plaintiff. Plaintiff also argues that the supervisors of Defendant C-Cliffs who had decision-making authority—Defendant Rinke, Maldonado, and Defendant Chappell—condoned Martz's behavior. Thus, the Court addresses each of their conduct in turn.

Turning first to Defendant Rinke, Plaintiff admits that Defendant Rinke did not use the n-word or participate in any of the conduct attributed to Martz. (Id. ¶ 84.) Plaintiff argues that Defendant Rinke condoned Martz's racially offensive comments by overhearing Martz's use of the nickname "Richie" (as opposed to "Black Richie") and failing to report, discipline, or reproach Martz. (Doc. No. 52 at 5.) Plaintiff's allegations against Defendant Rinke, however, are insufficient to refute Defendants' explanation of why he was terminated. Plaintiff points to no evidence that Defendant Rinke overheard or condoned Martz' comments beyond his own personal view of the situation. Compare (Doc. No. 52 at 5 (citing Potts' deposition) with Doc. Nos. 47-5 at 5 (transcribing Defendant Rinke's deposition) ("Q. Have you heard of anyone at [Defendant C-Cliffs] referring to [Plaintiff] as Black Richie? A. No."); 47-10 at 4 (recording Defendant Chappell denying being present for any jokes or slurs about African Americans made by himself, Dreibelbis, and Martz in the presence of Rinke)); see Sarullo v. U.S. Postal Serv., 352 F.3d 789, 800 (3d Cir. 2003) (per curiam) (requiring countervailing proof beyond a

plaintiff's personal view to establish pretext and defeat a motion for summary judgment). In fact, the undisputed evidence of record shows that Plaintiff chose not to report Martz's comments or conduct to Defendant Rinke or Maldonado, or through any of the anonymous avenues by which he could have reported discrimination. (Doc. No. 47-3 ¶¶ 8, 28, 64.)[12] As for Maldonado, the only evidence Plaintiff adduces with regard to her is that she investigated the use of the n-word. Because that evidence is insufficient to raise an inference of intentional discrimination, the Court turns to the actions and statements of Defendant Chappell.

As for Defendant Chappell, Plaintiff argues that Martz directed at Defendant Chappell a joke about Plaintiff's face being as dark as the black ski mask that Plaintiff was wearing. (Doc. No. 52 at 6.) Defendants contend that, even if that were true, Defendant Chappell played no part in Plaintiff's termination. (Doc. No. 55 at 6.) The Court agrees that, even if the Court were to draw the inference that Defendant Chappell heard and laughed at Martz's joke, the undisputed evidence of record demonstrates that Defendant Chappell did not take part in the initial suspension of Plaintiff, the meeting with Plaintiff's union representative, the Step Two meeting with Plaintiff, or the decision to terminate his employment. See (Doc. No. 47-3 ¶ 69 (indicating that Defendant Chappell took no part in the termination decision of Plaintiff)); Larochelle, 210 F. Supp. 3d at 691 (determining that summary judgment was warranted where plaintiff failed to point to evidence of racially discriminatory animus on the part of the decision-makers in her

---

[12] Although there is evidence in the record that Defendant Rinke told Plaintiff to "lay off Martz," that evidence does not suggest intentional discrimination. (Id. at 81.) Plaintiff testified that Defendant Rinke spoke with him after receiving complaints from Martz about Plaintiff. (Id.) If anything, the Court views that exchange as facially neutral or as an indication that Defendant Rinke might have done the same for Plaintiff had he reported Martz's comments. Regardless, Plaintiff fails to point to evidence of record supporting intentional discrimination emanating from Defendant Rinke relating to his decision to terminate Plaintiff.

termination).  Therefore, Defendant Chappell is not a decision-maker whose statements, actions, or lack thereof are causally linked to Plaintiff's adverse employment action.

The Court concludes that Plaintiff's Title VII and Section 1981 disparate treatment claims fail because the undisputed facts of record are insufficient to support a reasonable factfinder's conclusion that Defendants' articulated legitimate, nondiscriminatory reason for his termination was a pretext for intentional discrimination.  Accordingly, the Court will grant summary judgment in favor of Defendants as to Plaintiff's Title VII and Section 1981 disparate treatment claims.  The Court next considers whether Defendants are entitled to summary judgment as to Plaintiff's Title VII and Section 1981 hostile work environment claims.

###          b.          Title VII and Section 1981 Hostile Work Environment

As noted <u>supra</u>, to succeed on a hostile work environment claim under Title VII or Section 1981, a plaintiff must show: (1) the employee suffered "intentional discrimination" based upon a protected class; "(2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there was <u>respondeat</u> <u>superior</u> liability."  <u>See</u> <u>Nitkin</u>, 67 F.4th at 570.  When reviewing these types of claims, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>See</u> <u>Mandel</u>, 706 F.3d at 168 (quoting <u>Harris</u>, 510 U.S. at 23).

Defendants argue that Plaintiff has failed to establish the second element of a hostile work environment claim because the undisputed evidence of record does not demonstrate "severe or pervasive" discrimination.  (Doc. No. 48 at 23–25.)  Specifically, Defendants argue

that Plaintiff's testimony that Martz used the n-word "here and there" and there was no "steady diet of it" is vague as to the frequency and the period of time.  (Id.)  However, Plaintiff argues that Martz's use of the n-word was so frequent that he could not recall a specific time "absent some sort of diary or log."  (Doc. No. 51 at 19.)  Plaintiff further asserts that the undisputed evidence of record of Maldonado's investigation, Plaintiff's working alone, the use of the nickname "Black Richie", Martz's joke about Plaintiff's skin color, and Martz's comments about interracial marriages, taken together, are sufficient to establish severe or pervasive conduct.  (Id. at 20.)

The Court agrees with Defendants that Plaintiff has failed to establish the severe or pervasive prong of a Title VII or Section 1981 hostile work environment claim.  First, as to Martz's use of the n-word, Plaintiff testified that Martz used the n-word "here and there" at work, but "[i]t wasn't like a steady diet of it."  (Doc. No. 47-3 ¶ 19.)  As the Third Circuit in Nitkin stated, "[a plaintiff] may not rely merely on vague statements to defeat summary judgment."  See Nitkin, 67 F.4th at 571.  In Nitkin, the plaintiff alleged at least twenty-one (21) instances of harassing comments made by a lead doctor during weekly team meetings that happened "approximately once every other month during her three and a half year employment."  See id. at 570.  The plaintiff in Nitkin, however, could only identify five comments about which she could give any specifics.  See id.  Therefore, the district court disregarded the plaintiff's "generalized assertions of harassing conduct" because she asserted that the conduct occurred "regularly" or "all the time" instead of proffering concrete evidence of the twenty-one (21) harassing statements made by the lead doctor.  See id. at 571.  The Third Circuit upheld that decision.  See id.  Here, Plaintiff's vague and generalized testimony that Martz used the n-word "here and there" and there "wasn't a steady diet of it" (Doc. No. 47-3 ¶ 19), is similarly vague and therefore

constituted a "general, unsubstantiated allegation that the alleged conduct occurred," Nitkin, 67

F.4th at 741.  Therefore, the Court disregards the evidence of Martz's use of the n-word.  See id.

The Court next addresses the three (3) remaining instances of conduct identified by

Plaintiff and similarly concludes that they do not constitute "severe or pervasive" conduct.  First,

as to severity, Martz and Dreibelbis' use of the nickname "Black Richie" is offensive because of

its reference to an African American high school football player who was hit in the head with a

drink, but there is no evidence that the nickname rises to the level of severity that it "creates an

attitude of prejudice that injects hostility and abuse into the working environment."  See Ali, 957

F.3d at 182.  The nickname "Black Richie" or "Richie" is akin to the nicknames "Arabia Nights"

and "Big Egypt" from the case Ali v. Woodbridge Township School District in that both sets of

nicknames are born out of rude, offensive, and base observations of a person.  See id.  However,

as the Third Circuit held in Ali, "although these remarks are offensive, none of them rise to the

level of severity that would alter working conditions."  See id.  The same can be said for Martz's

joke about Plaintiff's skin color.  See Killen v. Nw. Human Servs., Inc., No. 06-cv-04100, 2007

WL 2684541, at *6 (E.D. Pa. Sept. 7, 2007) (holding that derogatory remarks about a plaintiff's

dark skin over three days, although offensive, did not satisfy the severe or pervasive element of a

hostile work environment claim).  As to Martz's remarks about Plaintiff's marriage, Plaintiff

himself remarked that he felt the comments were inapplicable to him and his wife who was

indigenous Canadian.  Plaintiff also continued to work with Martz for approximately five more

years after his wife's death and Martz's last comment about his marriage.  See (Doc. No. 47-4 at

25 (stating that Martz made comments about Plaintiff's marriage before his wife passed away in

2016.)  Therefore, the Court cannot conclude that Martz's comments on Plaintiff's marriage

"alter[ed] the conditions of [Plaintiff's] employment and create[d] an abusive work

environment," particularly when he felt the comments were inapplicable to him.  See Qin, 100
F.4th at 471.

  The Court also concludes that the evidence of record does not demonstrate pervasiveness
or frequency with regard to the "Black Richie" nickname, the comments about interracial
couples, and the joke about Plaintiff's skin color.  Plaintiff testified during his deposition that
Martz called him "Black Richie" starting approximately ten years ago.  (Doc. Nos. 47-3 ¶ 16; 47-
4 at 22–23.)  Plaintiff also testified that Martz made comments "once or twice" about his
disapproval of Plaintiff's marriage and comments about interracial dating "once or twice" a
month.  (Doc. No. 47-4 at 24–25, 27.)  Plaintiff noted that those comments about his marriage
happened "years ago", and prior to his wife's passing in 2016.  (Doc. No. 47-4 at 25.)  Further,
Plaintiff vaguely states that the statements were "a habitual practice."  (Doc. No. 52 at 7.)  As to
Martz's joke about Plaintiff's skin color, Plaintiff testified that the joke was made once sometime
during the COVID-19 pandemic.  (Id. at 19.)  Given the timeline of the conduct, and
disregarding the vague and generalized comments, the Court concludes that the remaining
comments and conduct occurred sporadically over the course of approximately a decade, which
is "too infrequent to constitute pervasive harassment."  See Qin, 100 F.4th at 471; see also
Nitkin, 67 F.4th at 571 (affirming the district court's exclusion of alleged discriminatory conduct
that happened "regularly" or "all the time").

  In sum, the Court concludes that, viewing the comments and conduct in totality, Plaintiff
has failed to point to evidence from which a reasonable factfinder could conclude that the
incidents were severe or pervasive so as to satisfy the second element of a hostile work

environment claim.[13]  Accordingly, the Court will grant summary judgment to Defendants on

Plaintiff's Title VII and Section 1981 hostile work environment claims.[14]  The Court turns to

Plaintiff's claims of disparate treatment discrimination under ADEA.

### 2.    Plaintiff's ADEA Claim of Disparate Treatment Discrimination

Similar to Plaintiff's Title VII and Section 1981 disparate treatment discrimination

claims, the Court need not resolve the parties' dispute regarding whether Plaintiff has adequately

demonstrated the fourth element of a prima facie case of ADEA discrimination, because, as noted

above, Plaintiff has failed to produce sufficient evidence demonstrating that Defendants'

legitimate, nondiscriminatory reason for terminating his employment—namely, Plaintiff's safety

violations—was a pretext for discrimination.  As noted supra, for Plaintiff's claims to survive

summary judgment when his former employer articulates a legitimate, nondiscriminatory reason

for its action, he must demonstrate pretext by either "(i) discrediting the proffered reasons, either

circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that

discrimination was more likely than not a motivating or determinative cause of the adverse

employment action."  See Fuentes, 32 F.3d at 764.

Plaintiff maintains that the undisputed evidence of record shows but-for causation for his

termination because he was at an age that was "especially advanced for his field," he was

subjected to the repeated commentary from Martz about retiring, and Defendant Rinke was

---

[13]  The Court notes that Plaintiff also identifies Maldonado's investigation and Plaintiff's
working alone as evidence of "severe or pervasive" conduct.  However, the Court agrees with
Defendants that those actions are facially neutral, and Plaintiff fails to provide evidence linking
those actions to any discriminatory conduct or statements.

[14]  Because Plaintiff fails to point to evidence from which a reasonable factfinder could conclude
disparate treatment discrimination or a hostile work environment under Section 1981, the Court
need not address Plaintiff's arguments as to individual liability.

present for the age-related commentary.  (Doc. No. 51 at 10–11.)  The Court concludes, however, that Plaintiff fails to provide evidence sufficient for a factfinder to reasonably conclude that Defendants' legitimate articulated reason for his termination was a pretext for intentional discrimination.  Despite Plaintiff's age being "especially advanced for his field," Plaintiff provides no evidence that Defendant Rinke or Maldonado contemplated his age when making the decision to terminate him.  Plaintiff merely speculates that his age was a factor in Defendants' decision to terminate Plaintiff, which is insufficient.  See Anderson, 477 U.S. at 249–50 ("If the evidence is merely colorable, [] or is not significantly probative, [] summary judgment may be granted.").

Plaintiff next identifies Martz's remarks telling Plaintiff that he should retire, and Defendant Rinke's presence when those remarks were made, as discrediting evidence of record. However, a stray comment by a coworker does not support an inference of age discrimination, even if uttered in the presence of a decision-maker.  See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 333 (3d Cir. 1995) ("We have held that stray remarks by [nondecision-makers] or by decision[-]makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.").  Moreover, Plaintiff has pointed to no evidence that Defendant Rinke was present for Martz's comments.  Rather, the undisputed evidence of record shows that Plaintiff never reported Martz's remarks about his retirement to Defendant Rinke, Defendant Chappell, Maldonado, or HR.  (Doc. No. 47-3 ¶ 32.) Plaintiff therefore fails to point to evidence beyond his own testimony that Defendant Rinke condoned Martz's comments about Plaintiff's age.  See Sarullo, 352 F.3d at 800 (requiring proof beyond a plaintiff's personal view to establish pretext and defeat a motion for summary judgment).

As to the other avenues by which Plaintiff could establish pretext, Plaintiff fails to provide evidence that Defendants hired a younger worker to fill his position. The undisputed evidence of record fails to demonstrate who Defendants hired to fill Plaintiff's position. See generally (Doc. No. 47-3 (stating that the last occurrence at the steel mill was Plaintiff's termination on November 30, 2021)). Moreover, Plaintiff provides no evidence of either an individual of his protected class who was discriminated against by Defendants or a similarly situated individual outside of his protected class who was treated more favorably. Accordingly, upon review of the evidence of record, and construing all facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to point to evidence in the record from which a factfinder could reasonably either disbelieve Defendants articulated reason for terminating Plaintiff's employment or believe that some invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendants decision to terminate Plaintiff's employment. Accordingly, the Court will grant summary judgment as to Plaintiff's ADEA claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment in its entirety. An appropriate Order follows.

s/ Yvette Kane\
Yvette Kane, District Judge\
United States District Court\
Middle District of Pennsylvania

31